CLERK'S OFFICE
A TRUE COPY
Aug 19, 2026
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin



# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
2820 West Wells Street, Apartment 315, Milwaukee, Wisconsin; a 2007 black, BMW 328; and target person. (See attachmentsA1-A3)

Case No. 26-MJ-121

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A1-A3.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 09/02/2026 *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m. ❒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable William E. Duffin .
*(United States Magistrate Judge)*

Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ____________ .

Date and time issued: 08/19/2026 at 9:20 a.m.

William E. Duffin
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ______________________

______________________________
*Executing officer's signature*

______________________________
*Printed name and title*

**ATTACHMENT A1**

**PLACE TO BE SEARCHED**

2820 West Wells Street, Apartment 315, Milwaukee, Wisconsin (**Target Location).** The residence is used by Ivan Anothony CAMACHO-VELAZQUEZ. The building is a three-story apartment building with a flat roof. The building has a tan brick exterior and a red in color front door grey concrete steps with red trim leading to the main entrance. The numbers 2820 are affixed to the building directly above the center of the front door. The residence is located on the third floor of the apartment building with a tan door and numbers 315 affixed in large gold to the door.






**ATTACHMENT A2**

**PERSON TO BE SEARCHED**

The person of Ivan Anothony CAMACHO-VELAZQUEZ (XX/XX/2005) **(Target Person)**.

## ATTACHMENT A3

### PLACE TO BE SEARCHED

A 2007 black, BMW 328, bearing Wisconsin license Temporary plate Z1308Z (BMW) (**Target Vehicle**).



## ATTACHMENT B

## ITEMS TO BE SEIZED

1. All records, information, and items relating to violations of Possession of a machinegun, and , unlawful sale or otherwise dispose of a firearm; unlawful possession of a firearm; possession of a machinegun; and transfer of a machinegun, violations of Title 18, United States Code Sections, 922(d)(1)&(10), 922(n), and 922(o) have been committed by Ivan Anothony CAMACHO-VELAZQUEZ (XX/XX/2005), herein CAMACHO, Jul S Rodriguez-Claudi (RODRIGUEZ) and other known and unknown individuals, occurring between October 2024 to present, including:

a. Machineguns, machine gun conversion devices, firearms, and firearm accessories;
b. Evidence of the crimes described above;
c. Evidence of preparatory steps taken in furtherance of those crimes under investigation;
d. Evidence of the existence, scope, or overt acts in furtherance of a conspiracy;
e. Evidence of motive, intent, or knowledge of the crime described above;
f. Paraphernalia and tools associated with drug trafficking, to include plastic bags, scales, duffel bags, and money counters;
g. Bank records, checks, credit card bills, checking and saving account information, and other financial records;
h. Lists of drug customers and related identifying information;
i. Documents and records identifying types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;
j. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);
k. Indicia of residency;
l. Safes, vaults, or lock boxes used to store proceeds or records from these crimes;
m. U.S. Currency;

n. Evidence indicating how and when electronic devices were accessed or used, to determine the chronological and geographic context of access, use, and events relating to the crime under investigation;

o. Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data.

p. Cellular telephones, computers, and electronic storage media (hereinafter DEVICE), and all electronic storage areas on such DEVICES including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data;

q. Evidence of the location, whereabouts, and patterns of travel of Ivan Anthony CAMACHO-VELAZQUEZ (XX/XX/2005).

r. Evidence about the appearance, clothing, and identity of Ivan Anthony CAMACHO-VELAZQUEZ (XX/XX/2005).

As used above, the terms “records” and “information” include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

During the execution of the search of the location described in Attachments A1-A3, law enforcement personnel are authorized (1) to press the fingers (including thumbs) of the **Target Person** to the fingerprint sensor (“Touch ID”) and (2) to present the face of the **Target Person** to the facial recognition sensor, such as a camera, (“Face ID”) of the devices found at the location for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

Note: The government will attempt to retrieve and copy all data from computers found at the location to be searched without physically removing said computers. If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment. If the agent determines that the volume of material found on the premises is voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized.

CLERK'S OFFICE
A TRUE COPY
Aug 19, 2026
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin



# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

2820 West Wells Street, Apartment 315, Milwaukee, Wisconsin; a 2007 black, BMW 328; and target person. (See attachmentsA1-A3)

Case No. 26-MJ-121

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A1-A3.

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 922(d)(1)&(10), 922(n), and 922(o) | Unlawful sale or otherwise dispose of a firearm; unlawful possession of a firearm; possession of a machinegun; and transfer of a machinegun |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Mitchell J. Ward
*Applicant's signature*

SA Mitchell Ward, DCI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 08/19/2026

William E. Duffin
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**Matter No.**

I, Mitchell WARD, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a state certified law enforcement officer employed as a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation, (DCI) and have been a sworn officer in the State of Wisconsin for over 34 years. I am currently assigned to DCI's Milwaukee Field Office, Narcotics Bureau. I am also a federally deputized task force officer for the United States Postal Inspection Service ("USPIS"). As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2. As a federal task force officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have also spoken on numerous occasions with other experienced

narcotics investigators, both foreign and domestic, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses which specialized in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

3. I have received training on in connection with, and conducted investigations of violations of the National Firearms Act, Gun Control Act, and Title 18, United States Code, Sections 922(g), 924(c) and others. Affiant has also received training and conducted investigations involving illicit drugs and the distribution of illicit drugs in violation of Title 21, United States Code, Sections 841, 843, 846 and others.

4. In the past 34 years I have received training in the investigation of the possession of firearms by prohibited persons; that affiant has worked with local, state and federal law enforcement agents investigating the possession, use and trafficking of weapons in the Milwaukee area; that affiant has participated in the execution of numerous search warrants in which weapons were seized; I am also familiar with the different types and calibers of firearms and ammunition commonly possessed for illegal purposes; and that affiant is professionally trained in the use of firearms; that affiant has conducted investigations involving the "straw" purchase of firearms which involves the intentional transfer of a firearm from a non-prohibited person to a prohibited person.

5. In addition to my training and experience, I have provided expert testimony in Wisconsin State court as a firearms expert. I have been a Wisconsin State certified law enforcement firearms instructor for the past 17 years. In addition, I have taught entry team and SWAT team tactics. I was assigned to Milwaukee HIDTA's narcotics entry team as a team leader from 2010-2013 as well as being assigned to the Wisconsin Joint Tactical Team during my employment with the Wisconsin Department of Justice.

6. I have conducted controlled purchases of firearms from both convicted felons and individuals who knowing sold firearms to convicted felons, prohibited from legally purchasing firearms. I have been involved in several hundred investigations involving illegal use, possession and transfer of firearms. I have been recognized by the United States Department of Justice for leading and contributing to federal firearms investigations.

7. I have participated in complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. More specifically, my training and experience includes the following:

a. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b. I have experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

c. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to

package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

d. I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations. I am familiar with the language utilized over the telephone or other communication applications to discuss drug trafficking, and know that the language is often limited, guarded, and coded. Additionally, I know that drug traffickers often change their phone numbers and cellular devices on frequent basis in an attempt to thwart law enforcement from tracking their phones and to conceal their identity.

e. I know that drug traffickers commonly have in their possession, and at their residences and other locations ("stash houses") where they exercise dominion and control, controlled substances, firearms, ammunition, drug proceeds, and records or receipts pertaining their drug trafficking;

f. I know that drug traffickers used what is refer to as a "stash house" to stow illegal items such as illegal controlled substance, packaging paraphernalia, illegal firearms, ledgers, and US currency. Often times members of drug trafficking organizations have to make stops at the stash locations to pick up illegal controlled substance to deliver. Additionally, drug traffickers will have customers meet drug traffickers near the stash location. Multiple stops can be made in a day at these locations. This is done so the trafficker does not have to carry additional illegal controlled substances in their vehicle or person or maintain them at their residence. This protects the trafficker from law enforcement investigations as they do not have illegal controlled substances on them after the delivery is made or inside their personal residence. Often time the US currency will be transported after the delivery to the stash house to protect against law enforcement investigation and rival drug trafficker's robbery crews.

g. I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking; and

h. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

8. I have also participated in the execution of numerous search warrants in which weapons, narcotics, and/or evidence of drug trafficking were seized in violation of state and federal laws. I am familiar with the different types and calibers of firearms and ammunition commonly

possessed for illegal purposes, as well as the methods used to conduct narcotics trafficking. I have had a variety of formal, informal, and on the job training in the investigation of illegal firearms possession firearms trafficking, and drug trafficking. Additionally, I am familiar with street name(s) of firearms, controlled substances, and respective related topics, as well as has knowledge of the use of money laundering to conceal ill-gotten money. I know that those engaged in drug trafficking will often possess firearms in order protect controlled substances, drug proceeds, and themselves from users, rival drug traffickers or others attempting to steal from the trafficker.

9. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

10. The facts in this affidavit come my personal participation in this investigation, and my review of reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; surveillance; seizure of physical evidence; review of social media accounts; and information obtained following arrest of co-conspirators and defendants. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

11. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

12. Based on the facts set forth in this affidavit, there is probable cause to believe that the crimes of, unlawful sale or otherwise dispose of a firearm; unlawful possession of a firearm; possession of a machinegun; and transfer of a machinegun, violations of Title 18, United States Code Sections, 922(d)(1)&(10), 922(n), and 922(o) have been committed by Ivan Anothony CAMACHO-VELAZQUEZ (XX/XX/2005), herein CAMACHO, Jul S Rodriguez-Claudi (RODRIGUEZ) and other known and unknown individuals.

13. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe search the locations and or persons described in Attachments A1-A3 for evidence of these crimes, as described in Attachment B.

**PLACE AND PERSONS TO BE SEARCHED**

14. **Attachment A1:** 2820 West Wells Street, Apartment 315, Milwaukee, Wisconsin (**Target Location).** The residence is used by Ivan Anothony CAMACHO-VELAZQUEZ. The building is a three-story apartment building with a flat roof. The building has a tan brick exterior and a red in color front door grey concrete steps with red trim leading to the main entrance. The numbers 2820 are affixed to the building directly above the center of the front door. The residence is located on the third floor of the apartment building with a tan door and numbers 315 affixed in large gold to the door.

15. **Attachment A2:** The person of Ivan Anothony CAMACHO-VELAZQUEZ (XX/XX/2005) (**Target Person)**.

16. **Attachment A3:** a 2007 black, BMW 328, bearing Wisconsin license Temporary plate Z1308Z (BMW) (**Target Vehicle**).

**PROBABLE CAUSE**

**A. Criminal History and Address Information**

17. CAMACHO is currently out of custody on $500 cash bail in Milwaukee County Case 026CM2037, related to carrying a concealed weapon. On July 5, 2026, CAMACHO made his initial appearance and was advised of his charge and ordered as a condition of his release to have no possession or use of dangerous weapons. CAMACHO'S list address on Wisconsin Circuit Court Access is: 1495 South Layton Boulevard, Milwaukee, WI 53215.

18. CAMACHO is currently out of custody on $5000 cash bail in Milwaukee County Case 2026CF002596, related to armed robbery. On July 5, 2026, CAMACHO made his initial appearance and was advised of his charge and ordered as a condition of his release to have no possession or use of dangerous weapons. CAMACHO'S list address on Wisconsin Circuit Court Access is: 1495 South Layton Boulevard, Milwaukee, WI 53215.

19. On August 11, 2026, a grand jury in the Eastern District of Wisconsin indicted CAMACHO on three counts, including violations of Title 18 United States Code, Sections 2(b), 922(o), and 924(a)(2) (26-CR-167). An arrest warrant was issued the same day.

20. Jul S Rodriguez-Claudi (RODRIGUEZ) had a prior offense for carrying a concealed weapon in Milwaukee County Case 2024CM37. He had a deferred prosecution in the matter and it was later dismissed.

21. Case agents are further aware that CAMACHO was arrest on July 1, 2026 and provide officers with his address of 2820 West Wells Street, Apartment 110. Case agents learned from building management that CAMACHO leases 2820 West Wells, Apartment 315 (**Target**

**Location**) not Apartment 110. Case agents reviewed leasing records, which shows that CAMACHO leases 2820 West Wells, Apartment 315 (**Target Location**) since May 1, 2026 (Figure 1).

| | | | | |
|---|---|---|---|---|
| Ivan Anthony Camacho Velazquez | 2820#315 | 2820 W Wells St #315 Milwaukee, | (414)840-9286 | 05/01/26 |

Figure 1

22. Further, lease paperwork from the location indicates Apartment 110 is rents by a Kathira V. Jurado since September 15, 2024. Case agents reviewed Wisconsin Department of Transportation records, which further indicated Kathiria J. Valentin lists 2820 W. Wells Street, #110 as her residence. The address was updated on March 20, 2025, consistent with the lease information. Case agents also reviewed call for services to 2820 W. Wells Street, #110. The most recent call was from July 16, 2026 and the call did not want to provide a name, but stated that ICE and the FBI raided his home and took his wife's firearms. Case agents are not aware of CAMACHO being married.

23. Case agents were conducting surveillance of CAMACHO on August 16, 2026. Case agents observed CAMACHO in the BMW (Target Vehicle) park at 2820 W. Wells Street. Case agents observed both CAMACHO and RODRIGUEZ entered the main entrance of the apartment building located at 2820 West Wells Street. Based on these observation and the investigation into CAMACHO, case agents believe CAMACHO is still residing at the **Target Location**.

**B. Machinegun Conversion Devices (MCD)**

24. That based on Affiants training and experience, Affiant knows an MCD is a device that converts a semi-automatic firearm into a fully automatic firearm (machine gun). This conversion enables the user to fire multiple bullets, at a rapid rate of fire, with the single pull of

the trigger. That MCD(s) related to handguns are commonly referred to as: Switch (Full auto switch / Glock switch) Auto-Sear, Invisi-Switch, Buttons, (*Butones*) and Chips (*Chipotes*). That AR15 / AK47 style MCD(s) are often referred to as: Swift Links, Lightning Links and *Rifles Rapidos*;

25. Your affiant knows through his training and experience that the popularity of MCD(s) has greatly increased within the City of Milwaukee and throughout the nation that has led to an increase of number of shots being fired at crime scenes. That affiant is also aware that the criminal element will often flaunt their firearms with MCD(s) and show off their arsenal of weapons in a manner to intimidate their enemies and boast to their social media followers.

**C. Camacho Investigation and Ongoing Criminal Conduct**

26. In October of 2024, case agents began investigating CAMACHO for the illegal possession and trafficking in MCDs. As part of the investigation, case agents located two social media accounts associated with CAMACHO in which his posts were consistent with the possession and sale of MCD.

27. For example, Milwaukee Police Detective Paul Martinez, who is a deputized temporary federal officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) discovered Instagram account viewable to the public associated to the vanity name of "**eldeladobletono**" with the profile name of "Anthony Velazquez". This profile displayed a link to a secondary Instagram profile of "Ivan Anthony Camacho," with the vanity name of "guatauba_9x3." TFO Martinez observed images of the same subject on both accounts and compared them with a booking photo of CAMACHO. TFO Martinez identified the main subject depicted in both Instagram accounts as CAMACHO.

28. Between 2024 and 2025, case agents continued their investigation, including court authorized access to CAMACHO's Instagram accounts. Throughout CAMACHO's Instagram accounts, case agents located message consistent with him engaged in the sale and possession of numerous MCD.

29. For example, on August 30, 2024, CAMACHO was communicating in Spanish with a buyer (chxino_g27). The buyer requested metal MCD (El q tu tienes es de metal; Necesito 3 de esos y 2 chipetes). CAMACHO responded with photos of colorful MCDs (Figure 2).



Figure 2

30. On October 18, 2024, a buyer asked in Spanish when will CAMACHO get him/her the button (Pa cuando mi boton bb?). CAMACHO responds by sending a photo of MCDs (Figure 3).



Figure 3

31. Case agents also located numerous photos of firearms, MCDs, and Camacho-Velazquez with firearms and machineguns on his Instagram accounts (Figure 4-6).









Figure 4 Figure 5 Figure 6

32. Case agents continued to investigate CAMACHO and attempted to identify his MCDs source. Case agents observed CAMACHO posted on his public Instagram account USPS tracking numbers (Figure 7), consistent with him waiting on MCDs parcels through USPS.



Figure 7

33. Case agents searched USPS databases and discovered parcel # 9400 1118 9956 1431 4079 15. The first ten digits of this parcel are identical to one of the tracking numbers posted by CAMACHO in Figure 7. This parcel was addressed to Ivan CAMACHO at 1495 S. Layton Blvd, Milwaukee, WI, a residence identified connected to CAMACHO. The parcel had a return address of 9099 8th St. Rancho Cucamonga, California. The parcel had an original weight of 2.0 ounces.

34. On December 20, 2024, case agents executed a federal search warrant on parcel 9200 1903 7589 5507 4158 35 addressed to *IV N CAMACHO* at 1524 S. Layton Blvd Milwaukee WI, a residence identified connected to CAMACHO. The parcel contained two MCDs packaged in the same manner as MCDs posted by CAMACHO on his Instagram account (Figure 8).




Figure 8

**a. Armed Robbery Investigation**

35. On February 22, 2026, Milwaukee Police officer Jose Flores was dispatched to 1039 South 5th Street (Cork Wine Bar) to investigate an armed robbery. The victim stated that he was at that location to purchase some designer sunglasses from subject known to him on Facebook,

"Javi." The victim got into the back seat of an auto being driven by the known subject. In addition to "Javi" there were two other subjects in the car. After producing the $700 agreed upon for the sunglasses, one subject produced a black handgun and obtained cash and the victims $2000 Cartier glasses. The victim was allowed to exit the auto after the robbery; he then fled inside a tavern located nearby to phone the police. Video surveillance footage from the tavern was obtained and depicted the suspect auto and the victim entering and exiting the car. CAMACHO was developed as a suspect in this robbery and charged in Wisconsin Circuit Court Case 2026CF002596 with Armed Robbery as a Party to a Crime on June 1, 2026. Also on June 1, 2026, an arrest warrant was issued for CAMACHO.

**b. July 1, 2026, arrest of CAMACHO**

36. On July 1, 2026, Milwaukee Police officers Zaragoza and Benitez responded to 2820 West Wells Street, Milwaukee, WI. Officers were attempting to locate and arrest CAMACHO who was wanted by the Milwaukee Police Department regarding an armed robbery investigation (Milwaukee County Case 2026CF2596). Officers located CAMACHO sitting in the driver's seat of a black BMW 328, bearing Wisconsin temporary plate Z1308Z (BMW), parked in the 2800 block of West Wells Street (near Target Location). Officers Zaragoza and Benitez (uniformed officers) approached CAMACHO and took him into custody. CAMACHO was with Jul Sebastian RODRIGUEZ-CLAUDIO (herein RODRIGUEZ). CAMACHO was wearing a black cross body bag that contained a loaded Glock model 20V, .10-millimeter semiautomatic pistol, bearing serial number ALV992. Case agents learned this firearm was purchased by RODRIGUEZ

on June 18, 2026,[1] though CAMACHO was in possession of the firearm. Case agents also learned that CAMACHO attempted to purchase the same firearm on June 1, 2026, but was denied purchase due to his warrant. The cross-body bag also contained a plastic sandwich bag containing approximately 13.9 grams of suspected marijuana. The officers also recovered plastic sandwich bag from CAMACHO's front right shorts pocket that contained approximately 26 grams of suspected marijuana. CAMACHO provided RODRIGUEZ with the key to the BMW. RODRIGUEZ also claimed possession of two Glock magazines, which were located inside the BMW. RODRIGUEZ provided a receipt showing the magazines were purchased at Brew City Shooters Supply on July 1, 2026.

37. CAMACHO provided the address of 2820 West Wells Street, Apartment 110, as his home address. Case agents learned from building management that CAMACHO leases 2820 West Wells, Apartment 315, Milwaukee, Wisconsin (**Target Locaiton**). I am aware that those engaged in illegal conduct, will often provide false information to law enforcement or in court records in an attempt to evade law enforcement detection and prevent legal process, including search warrant, being executed at their true residence. CAMACHO was charged in Wisconsin Circuit Court in case 2026CM002596 with Carrying a Concealed Weapon. CAMACHO did provided a Mirandized statement following his arrest. He admitted to being present for the robbery offense described above, but denied prior knowledge of the robbery. CAMACHO was asked questions regarding the sale of MCDs, but he requested an attorney and the interview ended.

---

[1] On the same date, RODRIGUEZ also purchased an American Tactical, Milsport 5.56mm AR pistol, bearing serial #MSA173730.

38. Case agents reviewed records and learned that since June 17, 2026, RODRIGUEZ has purchased five firearms from Brew City Shooters Supply, four Glock pistols and one AR style pistol.

39. On August 14, 2026, case agents conducted surveillance in the 2800 block of West Wells Street (near Target Location) attempting to verify CAMACHO's location prior to conducting an arrest operation. At 2:10pm, case agents observed CAMACHO arrive in the area operating the BMW. Case agents observed CAMACHO and RODRIGUEZ get out of the BMW and enter the main entrance of 2820 West Wells Street (complex of Target Location).

**c. August 16, 2026, Glock Purchase**

40. On August 16, 2026, at approximately 1:45pm, case agents were notified by Brew City Shooters Supply that RODRIGUEZ was inside the shop purchasing a firearm. Case agents were able to respond to the store and observed CAMACHO parked the furthest from the entrance of the gun shop. CAMACHO was operating the BMW. Once RODRIGUEZ emerged from the store and entered the BMW, the pair was surveilled to 2820 West Wells Street (near Target Location) where CAMACHO parked. Both CAMACHO and RODRIGUEZ entered the main entrance of the apartment building located at 2820 West Wells Street (complex of Target Location). Case agents observed RODRIGUEZ carrying a black backpack over his shoulder.

41. Case agents followed up at Brew City Shooters Supply regarding the firearm purchase. Case agents leaned that RODRIGUEZ purchased a Glock Model 17, bearing serial number CKDN998. The purchase including background check fee and sales tax was $772.47. RODRIGUEZ paid $700 in cash and the balance was placed on his debit card.

42. I know based upon my training and experience that Glock pistols are the most popular firearm being illegally converted to machineguns. During this investigation, HSI and

USPIS have recovered thousands of MCDs that are compatible with Glock Pistols from CAMACHO's source of MCDs. The design of the Glock pistol from generation one through generation five lends itself to being easily converted to an illegal machine gun by simply affixing an MCD to the rear of the pistol's slide. Based on the numerous firearms, specifically Glocks, RODRIGUEZ has purchased in a short amount of time, case agents believe CAMACHO is still engaged in trafficking MCD.

43. I know based upon my training and experience its common practice for prohibited persons to accompany straw purchasers to a legitimate gun store and remain nearby but not enter the store. It's widely known that gun store employes are trained to watch for prohibited persons accompany straw purchasers inside the store. I have been involved in investigations in which case agents have observed straw buyers emerging from a gun shop and immediately hand the gun off to the prohibited person.

44. I know that weapons can be secreted in any part of a residence including garages and storage areas related to the premises and on persons located in the residence; and that the execution of a search warrant usually results in the seizure of such items associated with firearms as cartridges, holsters, additional magazines, cleaning supplies, ammunition, and usually results in the recovery of personal property such as utility bills, canceled mail envelopes, bank statements, keys, photographs, videotapes, and other items or documents which establish the identities of persons in control of the premises and other items.

**Computers, Electronic Storage and Forensic Analysis**

45. As described above and in Attachment B, this application seeks permission to search for records that might be found on the **Target Location, Target Vehicle and/or Target Persons described in Attachments A1-A3**, in whatever form they are found. One form in which

the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

46. *Probable cause.* I submit that if a computer, cellular telephone, or storage medium is found on the **Target Location, Target Vehicle and/or Target Persons described in Attachments A1-A3**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

47. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **Target Location, Target Vehicle and/or Target Persons described in Attachments A1-A3** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic

storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

48. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application

software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

49. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

50. The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

51. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These

biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

52. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

53. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

54. If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

55. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in

some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

56. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

57. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

58. Due to the foregoing, any device found at the Target Location, in the Target Vehicle or on the Target Person (CAMACHO), during the execution of the search, law enforcement personnel may (1) press or swipe the fingers (including thumbs) of the Target Person to the fingerprint scanner of the device found; or (2) hold the device in front of the Target Person's face

to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

59. Based on the foregoing, I believe there is probable cause to believe crimes of , unlawful sale or otherwise dispose of a firearm; unlawful possession of a firearm; possession of a machinegun; and transfer of a machinegun, violations of Title 18, United States Code Sections, 922(d)(1)&(10), 922(n), and 922(o) have been committed by Ivan Anothony CAMACHO-VELAZQUEZ (XX/XX/2005), herein CAMACHO, Jul S Rodriguez-Claudi (RODRIGUEZ) and other known and unknown individuals. I further believe that there is probable to believe that located at and in the **Target Location, Target Vehicle,** and on the **Target Person** further described in Attachment A1-A3, there is evidence of these crimes, all of which is detailed more specifically in Attachment B, that a warrant issued authorizing the search of the same. I further believe that there is probable cause to believe that located at and in **Target Location, Target Vehicle,** and on the **Target Person** described in Attachment A1-A3, there is evidence of the Target Offenses. Case agents believe there are currently documents and records showing dominion and control of the **Target Location** and **Target Vehicle**, cellular telephones, electronic devices, and other computers, and other evidence of the offenses described above, located within the **Target Location, Target Vehicle,** and on the **Target Person** described in Attachments A1-A3. For all of the foregoing reasons, I request authorization to search the **Target Location, Target Vehicle,** and on the **Target Person** more fully described in Attachment A1-A3 for the things described in Attachment B.

<u>**ATTACHMENT A1**</u>

**PLACE TO BE SEARCHED**

2820 West Wells Street, Apartment 315, Milwaukee, Wisconsin (**Target Location).** The residence is used by Ivan Anothony CAMACHO-VELAZQUEZ. The building is a three-story apartment building with a flat roof. The building has a tan brick exterior and a red in color front door grey concrete steps with red trim leading to the main entrance. The numbers 2820 are affixed to the building directly above the center of the front door. The residence is located on the third floor of the apartment building with a tan door and numbers 315 affixed in large gold to the door.






## ATTACHMENT A2

**PERSON TO BE SEARCHED**

The person of Ivan Anothony CAMACHO-VELAZQUEZ (XX/XX/2005) (**Target Person**).

# <u>ATTACHMENT A3</u>

## PLACE TO BE SEARCHED

A 2007 black, BMW 328, bearing Wisconsin license Temporary plate Z1308Z (BMW) (**Target Vehicle**).



## ATTACHMENT B

## ITEMS TO BE SEIZED

1. All records, information, and items relating to violations of Possession of a machinegun, and , unlawful sale or otherwise dispose of a firearm; unlawful possession of a firearm; possession of a machinegun; and transfer of a machinegun, violations of Title 18, United States Code Sections, 922(d)(1)&(10), 922(n), and 922(o) have been committed by Ivan Anothony CAMACHO-VELAZQUEZ (XX/XX/2005), herein CAMACHO, Jul S Rodriguez-Claudi (RODRIGUEZ) and other known and unknown individuals, occurring between October 2024 to present, including:

a. Machineguns, machine gun conversion devices, firearms, and firearm accessories;
b. Evidence of the crimes described above;
c. Evidence of preparatory steps taken in furtherance of those crimes under investigation;
d. Evidence of the existence, scope, or overt acts in furtherance of a conspiracy;
e. Evidence of motive, intent, or knowledge of the crime described above;
f. Paraphernalia and tools associated with drug trafficking, to include plastic bags, scales, duffel bags, and money counters;
g. Bank records, checks, credit card bills, checking and saving account information, and other financial records;
h. Lists of drug customers and related identifying information;
i. Documents and records identifying types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;
j. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);
k. Indicia of residency;
l. Safes, vaults, or lock boxes used to store proceeds or records from these crimes;
m. U.S. Currency;

n. Evidence indicating how and when electronic devices were accessed or used, to determine the chronological and geographic context of access, use, and events relating to the crime under investigation;

o. Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data.

p. Cellular telephones, computers, and electronic storage media (hereinafter DEVICE), and all electronic storage areas on such DEVICES including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data;

q. Evidence of the location, whereabouts, and patterns of travel of Ivan Anthony CAMACHO-VELAZQUEZ (XX/XX/2005).

r. Evidence about the appearance, clothing, and identity of Ivan Anthony CAMACHO-VELAZQUEZ (XX/XX/2005).

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

During the execution of the search of the location described in Attachments A1-A3, law enforcement personnel are authorized (1) to press the fingers (including thumbs) of the **Target Person** to the fingerprint sensor ("Touch ID") and (2) to present the face of the **Target Person** to the facial recognition sensor, such as a camera, ("Face ID") of the devices found at the location for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

Note: The government will attempt to retrieve and copy all data from computers found at the location to be searched without physically removing said computers. If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment. If the agent determines that the volume of material found on the premises is voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized.